GREENBERG TRAURIG, LLP
JEFF E. SCOTT (SBN 126308)
E-Mail: *ScottJ@gtlaw.com*
2450 Colorado Avenue, Suite 400E
Santa Monica, CA 90404-5524
Telephone: (310) 586-7700
Facsimile: (310) 586-7800

GREENBERG TRAURIG, LLP
PHILIP R. SELLINGER (admitted *pro hac vice*)
E-Mail: *SellingerP@gtlaw.com*
TODD L. SCHLEIFSTEIN (admitted *pro hac vice*)
E-Mail: *SchleifsteinT@gtlaw.com*
200 Park Avenue
Florham Park, NJ 07932
Telephone: (973) 360-7900
Facsimile: (973) 301-8410

Attorneys for Defendant Canon U.S.A., Inc.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| STEVEN SHEIN, suing individually and on behalf of all others similarly situated; JASON INSALACO, suing individually and on behalf of all others similarly situated,<br><br>               Plaintiffs,<br><br>    vs.<br><br>CANON U.S.A., INC., a Delaware Corporation, and DOES 1 through 10,<br><br>          Defendants. | CASE NO.  08-CV-07323 CAS (Ex)<br><br>**DEFENDANT CANON U.S.A., INC.'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**<br><br>Date:    To be determined<br>Time:    To be determined<br>Dept.:    Courtroom 5<br>Judge:   Hon. Christina A. Snyder |

DEFENDANT CANON U.S.A., INC.'S MEMORANDUM OF POINTS AND AUTHORITIES
IN OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

NJ-226,919,791v1

# TABLE OF CONTENTS

Page

I.   INTRODUCTION .................................................................................... 1

II.  FACTUAL AND PROCEDURAL BACKGROUND ................................ 2

    A.   The Printers ..................................................................................... 2

    B.   Different Printer Users See Different Ink Level Status Messages ................ 3

        1.   Different messages received depending on Printer model.................. 3

        2.   Different messages received depending on computer OS ................. 5

        3.   "Page yield" data available for most Printers ................................ 5

    C.   Most Users Are Likely Unaffected By Ink Level Status Messages .............. 6

        1.   Other cues assist in gauging remaining ink level............................ 7

            a.   Visual observation .............................................. 7

            b.   Other ink detection refinements.................................. 7

        2.   Printer model and unique printing needs affect reaction to
            ink level status messages.................................................... 8

    D.   Different Printer Models Display Messages At Different Points .................. 9

        1.   Ink level detection method affects message timing ........................... 9

        2.   Individual user practices affect timing of ink level status
            messages.................................................................... 9

    E.   Important Differences Between Plaintiff And Other Printer Users.............. 10

        1.   Plaintiff's MP830 Model Is Relatively Unique ............................... 10

        2.   Plaintiff Uses His MP830 Model In A Relatively Unique
            Manner ..................................................................... 11

III. ARGUMENT AND AUTHORITY................................................................ 13

    A.   Standard For Class Certification Under Rule 23 ................................. 13

    B.   Individual Issues Of Liability Predominate Over Common Issues. ............. 14

        1.   What Ink Level Status Message(s) Each User Receives .................. 17

        2.   User reactions to ink level status message(s)................................ 18

        3.   Remaining ink levels in each user's cartridges when
            messages appear, and whether the user considers that level
            "material" .................................................................. 19

i

DEFENDANT CANON U.S.A., INC.'S MEMORANDUM OF POINTS AND AUTHORITIES
IN OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

NJ-226,919,791v1

4.    Each user's access to and reliance on additional information regarding remaining ink levels and likely page yields ......................19

5.    Business v. consumer use of Printers...................................................21

6.    Individual issues predominate even for a class of MP830 users..........................................................................................................21

C.    Plaintiff Has Not Pleaded An Ascertainable Class. .......................................21

D.    Class Treatment Of Plaintiff's Claims Would Not Be A Superior Method Of Adjudication..........................................................................................23

E.    Plaintiff's Claims Are Not Typical Of Those Of The Proposed Class.........................................................................................................................24

IV.   CONCLUSION.................................................................................................................25

NJ-226,919,791v1

# TABLE OF AUTHORITIES

## Federal Cases

*Amchem Prods., Inc. v. Windsor,*
    521 U.S. 591 (1997) ............................................................................................ 14

*Blackie v. Barrack,*
    524 F.2d 891, n.17 (9th Cir. 1975) ................................................................... 14

*Dukes v. Wal-Mart Stores, Inc.,*
    2010 WL 1644259 *4 (9th Cir., Apr. 26, 2010) ......................................... 13, 14

*Frosini v. Bridgestone Firestone N. Am. Tire, LLC,*
    2007 WL 2781656 (C.D. Cal. Aug. 24, 2007) ............................................ 16, 17

*Gen. Tel. Co. of Sw. v. Falcon,*
    457 U.S. 147 (1982) ............................................................................................ 13

*Gonzalez v. Proctor & Gamble Co.,*
    247 F.R.D. 616 (S.D. Cal. 2007) ................................................................. 24, 25

*Hodes v. Van's Int'l Foods,*
    2009 WL 2424214 *4 (C.D. Cal. July 23, 2009) ......................................... 19, 20

*In re Actimmune Mktg. Litig.,*
    2009 WL 3740648, at *16 (N.D. Cal. Nov. 6, 2009) ........................................ 14

*In re Facebook PPC Advert. Litig.,*
    2010 WL 1746143 *6 (N.D. Cal. Apr. 22, 2010) .............................................. 14

*In re Genesisintermedia, Inc. Sec. Litig.,*
    2007 WL 1953475 *15 (C.D. Cal. June 28, 2007) ........................................... 23

*In re Wells Fargo Home Mtg. Overtime Pay Litig.,*
    2010 WL 174329 *9 (N.D. Cal. Jan. 13, 2010) ............................................... 23

*Kelecseny v. Chevron, U.S.A., Inc.,*
    262 F.R.D. 660 (S.D. Fla. 2009) ...................................................................... 22

*Kingsbury v. U.S. Greenfiber,*
    LLC, 2009 WL 2997389 *10 (C.D. Cal. Sept. 14, 2009) ................................. 15

*Lymburner v. U.S. Fin. Funds, Inc.,*
    263 F.R.D. 534 (N.D. Cal. 2010) ..................................................................... 21

*Mahfood v. QVC, Inc.,*
    2008 WL 5381088 *5 (C.D. Cal. Sept. 22, 2008) ........................................... 15

*Mazur v. eBay, Inc.,*
    257 F.R.D. 563 (N.D. Cal. 2009) ..................................................................... 22

*Menagerie Prods. v. Citysearch,*
   2009 WL 3770668 (C.D. Cal. Nov. 9, 2009).......................... 16, 17

*Nelson v. Bd. of Educ. of Albuquerque Pub. Schs.,*
   2009 WL 6055840 *7 (D.N.M. Jan. 7, 2009) ......................... 22

*Quezada v. Loan Ctr. of Cal., Inc.,*
   2009 WL 5113506 *5 (E.D. Cal. Dec. 18, 2009) .................... 15

*Sanchez v. Wal Mart Stores, Inc.,*
   2009 WL 2971553 *2 (E.D. Cal. Sept. 11, 2009)................... 15, 23

*United Steel v. ConocoPhillips Co.,*
   593 F.3d 802 (9th Cir. 2010).......................................... 13

*Valentino v. Carter-Wallace, Inc.,*
   97 F.3d 1227 (9th Cir. 1996).......................................... 23

*Whiteway v. FedEx/Kinko's Office & Print Servs., Inc.,*
   2006 WL 2642528 *3 (N.D. Cal. 2006) ............................. 22

*Wiener v. Dannon Co.,*
   255 F.R.D. 658 (C.D. Cal. 2009)..................................... 24

*Yokoyama v. Midland Nat. Life Ins.,*
   594 F.3d 1087 (9th Cir. 2010)........................................ 17

*Zinser v. Accufix Res. Instit., Inc.,*
   253 F. 3d 1180 (9th Cir. 2001)........................................ 23

**State Cases**

*Cal. Grocers Ass'n v. Bank of Am.,*
   22 Cal. App. 4th 205 (1994) .......................................... 14

*Caro v. Proctor & Gamble Co.,*
   18 Cal. App. 4th 644 (1993) .......................................... 23

*In re Tobacco II Cases,*
   46 Cal. 4th 298 (2009) ................................................. 14, 15

*In re Vioxx Cases,*
   180 Cal. App. 4th 116 (2009) ......................................... 15

*Kaldenback v. Mut. of Omaha Life Ins. Co.,*
   178 Cal. App. 4th 830 (2009) ......................................... 15

*Kandel v. Brother Int'l Corp.,*
   CV 08-1040 DSF (C.D. Cal., Feb. 1, 2010) (RJN Ex. A) ....................... 20, 21

*Mass. Mut. Life Ins. Co.,*
   97 Cal. App. 4th at 1292-93.......................................... 14

DEFENDANT CANON U.S.A., INC.'S MEMORANDUM OF POINTS AND AUTHORITIES
IN OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

NJ-226,919,791v1

1

**<u>State Statutes</u>**

2

Cal. Civ. Code § 1761(d) ............................................................... 21

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

NJ-226,919,791v1

## I.   INTRODUCTION

Plaintiff alleges that PIXMA inkjet printers sold by Defendant Canon U.S.A., Inc. ("CUSA") have been purposely programmed to issue premature "ink out" messages to support CUSA's ink cartridge business.  Putting aside that Plaintiff's claims lack merit, this case is inappropriate for class treatment.[1]

The proposed class includes 173 different printer models encompassing numerous types, combinations and permutations of ink cartridges and ink level status detection methods, all of which affect the amount of cartridge ink remaining when an ink level status message is displayed.  Nor are the ink level status messages that the users receive "substantially the same," as Plaintiff claims.  In fact, they are very different across the numerous models, and these different messages prompt a variety of different reactions among printer users.

Even in those relatively rare instances where a user actually sees a message stating that "ink has run out," a reasonable user would understand that some ink still remains in the cartridge, since prompts allow the user to override the message and continue printing -- albeit advising that (depending on the cartridge type) continued printing will result in poor print quality or, on other models, potential printer damage.  Many, but not all, users follow these prompts to override the message and continue printing until the print quality becomes unacceptable.  Printer use and user practices also vary widely across the putative class.  Each of these differences affect how much, if any, ink remains at the point each individual user decides to replace an ink cartridge.  Indeed, many users do not replace cartridges at all but simply re-fill them with non-Canon brand ink purchased from third-party vendors.  These users have no conceivable claims of any harm resulting from the ink level status messages challenged here.  Thus, this is not a "one size fits all" case where resolving Plaintiff's claim could also resolve the claims of absent class members.

---

[1] Plaintiff no longer seeks to certify a national class, but only a class of California residents.  Nor does he seek class treatment of the conversion claim alleged in the Third Amended Complaint ("TAC"), but only his claims for violation of the CLRA and UCL.

These and other differences among the putative class members mean that thousands of "mini-trials" would be required to determine who could potentially participate in this lawsuit and who could not.  Even after that, it would be impossible to fashion a remedy.  Because of the number of factors that affect how much ink is still in the cartridge when ink level status messages are displayed, and because cartridges are discarded when replaced, it cannot be determined how much ink remained in a particular user's discarded cartridges, or even how many were discarded.

Plaintiff's experiences with his printer are also unique.  First, his printer is connected to a computer running on an Apple Macintosh ("Mac") operating system ("OS"), which affords a much more limited ink level status display than computers running on a Windows OS.  Plaintiff also acknowledges that he reacts to an "ink out" message differently from most users, who generally override the message and continue to print until the print quality becomes unacceptable.  Moreover, CUSA made available "page yield" data for Plaintiff's printer, which (had he looked at it, which he claims he has not) would allow him to estimate how many pages he could be expected to print from a single cartridge.  Whether Plaintiff received the benefit of his bargain on his printer and cartridges (i.e., whether he has been "injured") should be gauged by this data, not by whether some ink still remained when an "ink out" message displayed.

Thus, in addition to failing to meet the threshold requirement of an ascertainable class, Plaintiff cannot show that common issues predominate over individual ones, that a class action is a superior method of adjudicating the claims asserted, or that his claims are typical of those printer users he proposes to represent.  Plaintiff's class certification motion should be denied.

## II.   FACTUAL AND PROCEDURAL BACKGROUND

### A.   The Printers

The TAC defines the putative class to include 173 different models of Canon-brand PIXMA inkjet printers sold in the United States since November 2004 ("the Printers").  TAC ¶ 11; Declaration of Hajime Yamamoto dated June 4, 2010

2

DEFENDANT CANON U.S.A., INC.'S MEMORANDUM OF POINTS AND AUTHORITIES
IN OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

NJ-226,919,791v1

("Yamamoto Decl.") ¶ 1.[2]  The Printers were developed and designed by CUSA's parent company, Canon Inc. of Tokyo, Japan ("CINC").  Yamamoto Decl. ¶ 6.  Every year CINC makes Printer design improvements that add new functionalities and performance capabilities.  *Id.*  The proposed class thus encompasses several "generations" of evolving Printer designs.  *Id.* ¶ 28.

## B.   Different Printer Users See Different Ink Level Status Messages

Plaintiff incorrectly asserts that "[t]he automated representations that [CUSA] makes for all of the printers in the proposed class are substantially the same."  Pl. Br. at 6 (citing Torrijos Decl., Ex. 5).3  In fact, while all of the Printer models let the user know the ink level status, they differ significantly from one another  respecting the number, wording, display, and timing of these messages.  Also, most users can consult "page yield" data to estimate the actual number of remaining pages that they can expect to print from a particular cartridge, given their individual printing practices.

## 1.   Different messages received depending on Printer model

Contrary to Plaintiff's assertion, only certain earlier Printer models (about 10% of total Printer sales, and no Printer introduced after July 2006) just display a message that "ink has run out."  Yamamoto Decl. ¶ 32(a).  Later Printer models display multiple ink level status messages, the first indicating that ink "***may have*** run out" and, only later, indicating that ink "***has*** run out" (or that the "Printer [has] detected [an] ink out

---

[2] The 173 Printer models consist of 86 unique models, 59 refurbished models, 18 models that were bundled for sale with other products, and 10 models sold specifically for re-sale by a major retailer.  Each of the 173 Printer models has its own SKU number, by which CUSA tracks sales of that particular model.  Yamamoto Decl. ¶ 1 n.1.

[3] Exhibit 5 (which constitutes Plaintiff's "proof" that the ink level status messages are all substantially the same) is rife with errors.  First, it does not include all Printer models in the proposed class.  Indeed, it does not include Plaintiff's MP830.  *See* Declaration of Marc Groves dated June 7, 2010 ("Groves Decl.") ¶ 4.  Moreover, Exhibit 5 does not even discuss the ink level status messages displayed on a user's computer screen.  *Id.* ¶ 3.  Finally, Exhibit 5 often lists the same Printer model twice, giving the misleading impression that messages are common across many models, and often inaccurately states message language or omits additional messages that a model displays.  *Id.* ¶¶ 4-9.

3

condition."). *Id.* And this subsequent message is almost never actually seen because, well before it displays, print quality has deteriorated significantly, motivating the user to replace the cartridge. *Id.* Moreover, Printer users who see "ink out" messages will typically also see an accompanying graphic depicting some amount of remaining ink, and that graphic never shows an empty ink cartridge. *Id.* ¶ 32(a), Ex. A.4 The graphic display tells a reasonable user that there is still ink left in the cartridge. While messages on some Printer models advise the user that "the printer may be damaged if printing is continued under the ink out condition," messages on other models do not mention that concept at all but, instead, advise the user that "[t]he resulting print quality is not satisfactory, if printing is continued under the ink out condition." *Id.* ¶ 32(a).

Although the display of some ink level status messages does not affect a Printer's ability to continue printing, the display of other messages temporarily prevents further printing until the user presses the "OK," "RESUME" or similar key. Some Printer models instruct the user to proceed with printing by pressing such keys, while users of other models must refer to a User's Guide to determine how to override the message. *Id.* ¶ 37. Regardless of the substantial differences in their exact wording, these messages make clear to reasonable users that, notwithstanding the display of a particular message, ink still remains in the cartridge and printing can continue.[5]

Thus, "ink-out" messages differ significantly across Printer models and may:

- Disclaim liability for "malfunction or trouble" caused by further printing;
- Discuss the possibility of printer damage from further printing;
- Discuss the possibility of "unsatisfactory print quality" from further printing;
- Discuss risk associated with "the mixing of inks";
- Discuss impact on the user's ability to print facsimiles;

---

[4] Some Printers also contain separate LCD screens that display ink level status graphics or messages in addition to those displayed on the user's computer monitor, such as those upon which Exhibit 5 to the Torrijos Declaration is focused. *Id.* ¶ 39.

[5] This holds true across all Printer models, i.e., all Printer users are able to continue to print after an "ink out" message is initially displayed.

4

DEFENDANT CANON U.S.A., INC.'S MEMORANDUM OF POINTS AND AUTHORITIES
IN OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

NJ-226,919,791v1

1  • Direct the user on how to continue printing; or

2  • "Recommend" that the user not print any further or replace the cartridge.

3  *Id.* ¶ 32.

4  ## 2.   Different messages received depending on computer OS

5  For Printers connected to computers running on Windows OS, eight different types

6  of ink level status messages can be displayed in different combinations at different points

7  relative to the level of cartridge ink remaining:  (1) an "Ink Low" message; (2) a second

8  "Ink Low" message; (3) an "Ink Out" message; (4) a second "Ink Out" message; (5) a

9  third "Ink Out" message; (6) an "Ink Out (Empty)" message; (7) an "Ink Remaining

10  Unknown"  message; and (8) an "Ink Remaining Unknown" error message.  And

11  messages (6) and (8) contain multiple levels of sub-messages.  *Id.* ¶ 30.  In addition,

12  when Windows OS users see an ink level status message displayed on their computer

13  screen, they also see a graphic display corresponding generally to the current remaining

14  ink level in each cartridge.  *Id.* ¶ 33.

15  By contrast, for Printers connected to computers running on Mac OS (like

16  Plaintiff's Printer), only five types of ink level status messages can be displayed:  a first,

17  second and third "Ink Out" message, an "Ink Out Empty" message and an "Ink

18  Remaining Unknown" error message, each of which is significantly more simple in

19  design than its Windows counterpart (because the Mac's architecture permits only a

20  limited amount of screen text display).  *Id.* ¶ 34.  Unlike Windows OS users, when Mac

21  OS users (e.g., Plaintiff) see an ink level status message, they must install and run a

22  special printer utility program to view a graphic display corresponding generally to the

23  current remaining ink levels in the cartridge.  *Id.* ¶ 35.

24  ## 3.   "Page yield" data available for most Printers

25  Users of most Printer models have access to detailed information about ink

26  cartridge "page yields."  Declaration of Thomas L. Miller, dated June 4, 2010 ("Miller

27  Decl."), ¶¶ 2-5.  Page yield data lets users know the average number of pages the user can

28  expect to print from the cartridge under a number of different conditions or assumptions.

DEFENDANT CANON U.S.A., INC.'S MEMORANDUM OF POINTS AND AUTHORITIES
IN OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

NJ-226,919,791v1

*Id.* ¶ 2. For Printer models sold before late 2006, including the iP5000 model owned by former Plaintiff Steven Shein, page yield data was included in an appendix to the User's Guide. *Id.* ¶ 3. After late 2006, page yield data was no longer included in User's Guides. For most Printers (including Plaintiff's MP830 model), the page yield data was instead made available on CUSA's website, together with the methodology explaining how the data was calculated. *Id.* ¶¶ 5-7, Exs. A, B. For some Printers introduced after late 2006, however, page yield data was unavailable to the user. *Id.* ¶ 5.

### C.   Most Users Are Likely Unaffected By Ink Level Status Messages

As a matter of well-accepted marketing theory and practice, ink level status messages could likely have affected only a small percentage of Printer users in a way that could conceivably relate to the "injury" alleged in the TAC. Expert Report of Yoram ("Jerry") Wind, dated June 7, 2010 (attached to the Declaration of Yoram ("Jerry") Wind), dated June 7, 2010), ¶ 13. Some users -- perceiving the messages simply as bothersome "pop-ups" -- just press "RESUME" (or similar keys) and do not really "see" the messages at all. *Id.* ¶¶ 8-9. Other users may see the messages, but consciously override them so that they can continue to print until print quality becomes unacceptable. *Id.* ¶¶ 10-13. Still other users never replace ink cartridges at all, but instead re-fill them with non-Canon brand ink purchased from third-party vendors. *Id.* ¶ 7. This logical winnowing process likely leaves only a very small number of users who could conceivably have been affected by the ink level status messages in the way described in the TAC, and there is no practical way to reach or even identify them. *Id.* ¶¶ 13, 17.

Dr. Wind's conclusions are borne out by Mr. Shein's testimony that he did not initially notice the language in the "ink out" message indicating the risk of potential Printer damage from continuing to print in that condition. Deposition of Steven Shein, dated Mar. 25, 2010 ("Shein Tr.") (attached to the Declaration of Jeff E. Scott, dated June 7, 2010 ("Scott Decl."), as Ex. A), at 75:6-15. Even after noticing that language, at some point, Mr. Shein began to override the message and continue printing because he "was willing to take that risk." *Id.* at 75:22-76:12. Mr. Shein testified that he now consistently

6

overrides the "ink out" message and continues to print until he can no longer "get the same print quality." *Id.* at 73:5-74:8, 80:3-10.

### 1. Other cues assist in gauging remaining ink level

Depending on Printer model, users can actually see the amount of cartridge ink remaining when an ink level status message is displayed. In addition, some Printer models contain features that enhance ink level detection accuracy.

#### a. Visual observation

Depending on Printer model and whether the ink cartridge is integrated or non-integrated (as discussed below), a Printer may use one of three cartridge platforms: (1) "full-sponge" cartridges contain an ink chamber filled with an ink-absorbed sponge; (2) "full-liquid" cartridges contain an ink chamber filled with liquid ink; or (3) "half-liquid" cartridges contain two connected chambers, one with liquid ink and the other with an ink-absorbed sponge. Users of Printers with half-liquid and full-liquid cartridges are actually able to *clearly observe* the level of ink remaining in the transparent liquid chamber and the entire cartridge, respectively. Users of full-sponge cartridges, however, cannot observe remaining ink levels. *Id.* ¶¶ 9-11.

#### b. Other ink detection refinements

Later generations of Printers using half-liquid cartridges include an LED display that flashes slowly or rapidly depending on the ink level. *Id.* ¶ 39. Moreover, beginning in July 2005, a functional memory chip was installed in some non-integrated cartridges, which further enhanced the ink level detection function of Printers using those cartridges. *Id.* ¶¶ 20-25. Also that month, another type of memory device called a "fuse element" was installed in some integrated cartridges. *Id.* ¶¶ 20, 26. Although fuse elements are not as effective in determining ink level as functional memory chips, Printers with cartridges containing fuse elements are more accurate at detecting ink level than are Printers with cartridges that do not contain fuse elements. *Id.* ¶ 27.

NJ-226,919,791v1

2.   **Printer model and unique printing needs affect reaction to ink level status messages**

Printer users react very differently upon viewing a particular ink level status message depending on their model of Printer, their own printing needs and other factors unique to them.  Yamamoto Decl. ¶ 70.  For example:

- User behavior is affected by the number of messages displayed by the Printer and by instructions on how to override the message, *id.* ¶ 75, which lets a reasonable user know that the cartridge is not actually empty.  Wind Report ¶¶ 6, 9, 18.

- User reaction is affected by the number of different ways in which messages are displayed and by the user's ability and willingness to view remaining ink levels by examining the wholly or partially transparent cartridge.  Yamamoto Decl. ¶¶ 76, 79; Wind Report ¶¶ 6-7, 9, 18.

- Unlike users of Printers containing an ink cartridge that is separate from the print-head (a "non-integrated cartridge"), users of Printers that contain an ink cartridge that is "integrated" with the print-head are likely to be more concerned with deteriorating print quality upon receiving an "ink out" message than with potential printer damage, since the print-head is discarded with the ink cartridge.  Yamamoto Decl. ¶¶ 8, 71-72; Wind Report ¶ 7.  Such users are likely to continue printing until print quality diminishes.

- Upon receiving a message, frequent business users of Printers are likely to be more concerned with print quality than consumer users.  Yamamoto Decl. ¶ 78; Wind Report ¶ 10.

- User reactions differ based upon the type and volume of print job at issue when the message appears, the type of print media being used, the content of previous jobs and the number of previously-printed pages.  Yamamoto Decl. ¶¶ 73-74; Wind Report ¶ 15.

In addition, Mac OS users who run the appropriate printer utility to allow graphic displays that correspond generally to current remaining ink levels are likely to discard cartridges with different amounts of ink remaining than Mac OS users who opt not to run the utility and, thus, see no graphic displays. *Id.* ¶ 77. (As noted, all Windows OS users are able to view graphic displays.)

## D.   Different Printer Models Display Messages At Different Points

Plaintiff's claim relates to the amount of cartridge ink remaining when ink level status messages are displayed; however, that depends on a number of factors, including the type of ink level detection method used by the Printer and individual user practices.

### 1.   Ink level detection method affects message timing

The type of ink level detection method used in a particular Printer model depends on the cartridge platform used by that model (i.e., full-sponge, full-liquid or half-liquid). All cartridges allow the Printer to use a "dot counting" method of ink level detection, in which the Printer calculates the number of ink droplets likely to be ejected based on the needs of the particular print job and records the calculation in the Printer's memory. However, only those Printers compatible with half-liquid cartridges employ an additional ink level detection method known as "optical sensing," in which an optical sensing unit detects when the liquid chamber is empty. *Id.* ¶¶ 12-19. Thus, Printer models that use half-liquid cartridges are more accurate in determining remaining ink levels than Printer models that use full-sponge and full-liquid cartridges. *Id.* ¶¶ 16, 20.

### 2.   Individual user practices affect timing of ink level status messages

Individual user practices affect how much ink a Printer consumes, which causes ink level status messages to be displayed at different points relative to remaining ink levels. *Id.* ¶¶ 41-42, 80-81. For example, the level of cartridge ink remaining when such messages are displayed varies significantly depending on how frequently users print, whether users frequently print with different colored inks, the type of print media used (e.g., plain or glossy paper), and whether the Printer is kept plugged in when not in use. *See id.* ¶¶ 43-48. The level of cartridge ink remaining when ink level status messages are

9

displayed also varies depending on whether non-Canon brand ink is used in the Printers.[6]
Using third-party ink can create inaccuracies in the Printers' ink level detection
functions, which result in ink level status messages being received at varying times
relative to actual ink levels. *Id.* ¶¶ 55-60.

Other factors affecting the level of remaining ink include the amount of ink
initially present in a cartridge at installation, the volume of the ink droplet that the model
ejects onto the print medium, and the volume of ink used in the model's automatic
"purging" maintenance process. These factors vary in significance depending on the type
of cartridge used by the particular Printer model. *Id.* ¶¶ 38, 43-54.

E.    **Important Differences Between Plaintiff And Other Printer Users**

1.    **Plaintiff's MP830 Model Is Relatively Unique**

Released in early 2006, Plaintiff's MP830 is an "Office All-in-One Printer": a
multi-function machine designed primarily for business use in homes and small offices.
*Id.* ¶ 61. The MP830 is substantially different from other Printer models in many
significant respects. First, Plaintiff's MP830 uses half-liquid cartridges enhanced with a
functional memory chip and employing both dot counting and optical sensing to detect
ink levels. *Id.* ¶¶ 63-64. Thus, Plaintiff's Printer is able to calculate ink level status
more accurately than Printers that lack these enhancements or those with full-sponge or
full-liquid cartridges. The half-liquid cartridge in Plaintiff's Printer also permits ***clear***
***visual observation*** of the level of ink remaining in the transparent liquid chamber. The
MP830 also has other enhancements not present on many other Printer models, including
a color LCD screen that displays2 ink level status messages with its own accompanying
graphics; an "alarm lamp" that lights or flashes orange when an ink level status message
is pending; and an additional system of LEDs on the individual ink cartridges that light or
flash red to indicate ink level status. *Id.* ¶ 65.

---

[6] Some Printer users buy non-Canon-brand ink and manually re-fill the cartridges; some
buy Canon ink cartridges re-manufactured by third parties; and some (like Plaintiff) buy
non-Canon ink cartridges from third parties, such as major retail stores. *Id.* ¶¶ 55, 59.

NJ-226,919,791v1

At the same time, because the MP830 uses a non-integrated cartridge, ink level status messages display earlier than in Printer models using integrated cartridges. The purpose of this earlier display is to protect the MP830's component print-head, which is retained for continued use rather than discarded with the cartridge body. The fact that the MP830's print-head is not discarded also means that the ink level status message that Plaintiff receives alerts the user to the risk of potential printer damage (e.g., to the print-head) from continuing to print in an "ink out condition." By contrast, users of Printer models with integrated cartridges are not advised of this specific risk, but only that printing in the ink out condition will cause print quality to deteriorate. *Id.* ¶ 62.

In addition, the MP830 displays an "ink out" message that advises the user that the cartridge *has* run out of ink. It also displays additional language advising that the "ink out" condition will affect the user's ability to print faxes. By contrast, other models display multiple "ink out" messages, the earliest of which indicates that the printer "*may have*" run out of ink, and the later "ink has run out" message is generally never seen (because deteriorating print quality has already necessitated cartridge replacement). In short, the MP830 is relatively unique, having been introduced just at the point when ink level detection methods had evolved to become more sophisticated, but before the change to multiple levels of "ink-out" messages. Thus, the MP830 detects ink levels more accurately than other Printer models, yet displays only an "ink has run out" message and does so earlier than other models. *Id.* ¶¶ 66-67.

Finally, unlike many other Printer models that use only a single volume of color ink droplet, the MP830 uses two different volumes of color ink droplets. *Id.* ¶ 68. Because ink droplet size affects the amount of ink remaining when the messages are displayed (*see* Sect. D(2), *supra*), that is yet another factor setting Plaintiff apart from many other users.

## 2. Plaintiff Uses His MP830 Model In A Relatively Unique Manner

Plaintiff uses his MP830 with only a single Mac computer. Deposition of Jason Insalaco, dated Mar. 24, 2010 ("Insalaco Tr.") (attached to Scott Decl. as Ex. B) at 35:9-

21, 36:24-37:1.  He uses his MP830 relatively infrequently:  15-25 times per month for two to five minutes each.  *Id.* at 46:16-47:1.  Plaintiff typically prints only about two to four pages of black-and-white text (*id.* at 38:17-21, 39:16-19), color photos about every two months and, occasionally, color text.  *Id.* at 39:13-15, 40:11-14.  Almost all of Plaintiff's printing is on plain paper.  *Id.* at 45:15-22.[7]  These practices affect the amount of ink remaining when ink level status messages are displayed.  *See* Sect. D(2), *supra.*

Plaintiff testified that he relies exclusively on the ink level status messages displayed on his Mac and LCD screen.  In other words, he claims that he never opens the printer cover to observe the LEDs on the cartridges or the actual remaining ink levels in the transparent part of the cartridges (which, with his half-liquid cartridges, he would be able to *clearly* observe).  *Id.* at 52:1-4, 54:18-21, 55:14-24, 57:12-24, 63:7-12, 69:18-70:21.  That fact sets Plaintiff apart from those half-liquid or full-liquid cartridge users who visually check remaining ink levels and make their cartridge-discarding decisions accordingly.  Of course, users of full-sponge cartridges cannot observe remaining ink levels.  *See* Sect. D(1), *supra.*

Plaintiff also claims that his response to the "ink out" message has *never* varied since he purchased his Printer:  every time the message is displayed, he immediately replaces the cartridge and does not attempt to continue printing.  *Id.* at 65:14-66:23, 164:11-20.  His sole purported reason is the language in the "ink out" message advising about the risk of printer damage.  *Id.* at 81:15-82:6.  Even if his testimony is credited, Plaintiff acknowledges that other Printer users react differently than he does, ignoring the

---

[7] This contrasts sharply with Mr. Shein's practices:  He uses his Printer, which is currently connected to a PC running Windows OS, "a lot for art projects [and] printing images," including digital images, and occasionally prints hundreds of pages at a time.  Shein Tr. at 48:19-49:8, 50:5-51:1, 61:12-62:8.  He occasionally prints for as long as five hours at a time and for 30 to 40 hours per week.  *Id.* at 58:10-18, 59:13-20.  Between 50% and 80% of his printing consists of color text or images, and he often uses more of one particular color.  *Id.* at 52:13-53:11.  He uses a variety of print media with his Printer, including iron-on transfers, photo paper, glossy and semi-glossy paper, card stock, sticker paper, and magnet paper.  *Id.* at 56:13-57:5, 57:19-21.

12

DEFENDANT CANON U.S.A., INC.'S MEMORANDUM OF POINTS AND AUTHORITIES
IN OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

NJ-226,919,791v1

1  messages altogether and continuing to print. *Id.* at 154:3-8; Wind Report ¶¶ 6-12. Mr.

2  Shein's reactions confirm that point. *See* Sect. C, *supra* (Mr. Shein currently overrides

3  ink out messages and continues to print until print quality deteriorates).

4      When purchasing replacement ink for his MP830, Plaintiff has purchased non-

5  Canon ink cartridges from "big box" retailers approximately 50% of the time. Insalaco

6  Tr. at 128:6-11. Using non-Canon ink affects the amount of cartridge ink remaining

7  when ink level status messages are displayed. *See* Sect. D(2), *supra.*

8      Page yield data for Plaintiff's MP830 Printer is available on CUSA's website.

9  Miller Decl. ¶ 6, Ex. A. Plaintiff testified that he has never reviewed this data, nor tried

10  to ascertain this information from any other source. Insalaco Tr. at 175:25-176:4. Of

11  course, other Printer users may use page yield data to estimate the number of printable

12  pages from, and thus the remaining useful life of, their cartridges. This is one more

13  difference between and among Plaintiff and the putative class members.

14  **III.   ARGUMENT AND AUTHORITY**

15      **A.   Standard For Class Certification Under Rule 23**

16      A court may certify a class only if the party seeking certification can support each

17  of the four requirements of Rule 23(a): (1) numerosity; (2) commonality; (3) typicality;

18  and (4) adequacy of representation. *United Steel v. ConocoPhillips Co.,* 593 F.3d 802,

19  806 (9th Cir. 2010). That party must also show that the action is maintainable under one

20  of the three alternatives in Rule 23(b), the relevant one here being Rule 23(b)(3), which

21  requires that Plaintiff show predominance and superiority. *See* Pl. Br. at 8.

22      Trial courts must conduct a "'rigorous analysis'" to ensure that the Rule 23

23  prerequisites are met. *Dukes v. Wal-Mart Stores, Inc.,* 2010 WL 1644259 *4 (9th Cir.,

24  Apr. 26, 2010) (quoting *Gen. Tel. Co. of Sw. v. Falcon,* 457 U.S. 147, 161 (1982)).

25  Contrary to Plaintiff's assertion that a court can simply rely on the pleadings, in fact, the

26  court's "analysis will often … require looking behind the pleadings, even to issues

27  overlapping with the merits of the underlying claims." *Id.* at *5; *see also id.* ("*Falcon's*

28  central command requires district courts to ensure that Rule 23 requirements are actually

met, **not simply presumed from the pleadings**.") (emphasis added).  In other words, "whether the suit is appropriate for class resolution must be actually demonstrated, not just alleged, to the district court's satisfaction." *Id.* at *13.  Notably, Plaintiff cites a 35-year-old case, *Blackie v. Barrack,* 524 F.2d 891, 901, n.17 (9th Cir. 1975), for the proposition that, on class certification motions, "the court 'is bound to take the substantive allegations of the complaint as true.'"  Pl. Br. at 8.  That is not the current state of the law.  The Ninth Circuit recently noted that "*Blackie* does not, and could not, require the district court to unquestioningly accept a plaintiff's arguments as to the necessary Rule 23 determinations." *Dukes,* 2010 WL 1644259 at *11-*12.

Plaintiff fails to meet the Rule 23 requirements of predominance, superiority and typicality, as well as the threshold requirement of an ascertainable class.

### B.   Individual Issues Of Liability Predominate Over Common Issues.

Rule 23(b)(3)'s predominance requirement "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 623 (1997).  Predominance is a far more demanding standard than commonality, requiring "a district court to formulate 'some prediction as to how specific issues will play out in order to determine whether common or individual issues predominate in a given case.'" *Dukes,* 2010 WL 1644259 at *15 (citation omitted).

A CLRA claim requires that a class representative show actual causation and reliance with respect to **each class member**. *In re Actimmune Mktg. Litig.,* 2009 WL 3740648, at *16 (N.D. Cal. Nov. 6, 2009).  Reliance may be inferred only "'**if the trial court finds material misrepresentations were made to the class members**.'" *Id.* (quoting *Mass. Mut. Life Ins. Co.,* 97 Cal. App. 4th at 1292-93) (emphasis added)); *see also In re Facebook PPC Advert. Litig.,* 2010 WL 1746143 *6 (N.D. Cal. Apr. 22, 2010) (citing *In re Tobacco II Cases,* 46 Cal. 4th 298, 326 (2009)) (to presume reliance, alleged misrepresentation must have been material).  Moreover, the CLRA does not apply to persons who purchase a product for business use. *See Cal. Grocers Ass'n v. Bank of Am.,* 22 Cal. App. 4th 205, 217 (1994).

NJ-226,919,791v1

1    For claims under the UCL's "fraudulent" prong (which Plaintiff asserts here), the

2  proponent of class certification must show that the supposed misrepresentations or

3  omissions "would have been '*material*' to the reasonable consumer." *Sanchez v. Wal*

4  *Mart Stores, Inc.,* 2009 WL 2971553 *2 (E.D. Cal. Sept. 11, 2009) (emphasis added)).

5  "In order for non-disclosed information to be material, a plaintiff must show that 'had the

6  omitted information been disclosed, one would have been aware of it and behaved

7  differently.'" *Id.* (citations omitted).  Significantly, although the California Supreme

8  Court has held that "UCL relief is available on a class basis 'without individualized proof

9  of deception, reliance and injury" (*see Tobacco II,* 46 Cal. 4th at 320), that holds true

10  only where there has been "uniform conduct likely to mislead the entire class...."

11  *Kaldenback v. Mut. of Omaha Life Ins. Co.,* 178 Cal. App. 4th 830, 850 (2009); *see also*

12  *Mahfood v. QVC, Inc.,* 2008 WL 5381088 *5 (C.D. Cal. Sept. 22, 2008) (common issues

13  did not predominate where UCL plaintiff could not identify "single practice, policy or

14  defect affecting all of Plaintiff's proposed class members in the same way").

15    Likewise, reliance cannot be inferred unless the alleged misrepresentation was

16  material.  *See, e.g., Quezada v. Loan Ctr. of Cal., Inc.,* 2009 WL 5113506 *5 (E.D. Cal.

17  Dec. 18, 2009) (defendant "effectively rebutted any … presumption [of reliance] by

18  introducing evidence that particular class members were either aware of the loan terms or

19  would have purchased the loans even if the terms were clearly disclosed in the

20  documents"); *Kingsbury v. U.S. Greenfiber, LLC,* 2009 WL 2997389 *10 (C.D. Cal.

21  Sept. 14, 2009) ("Any inference of reliance that could be drawn from [defendant's]

22  alleged misrepresentations are overcome by the overwhelming evidence that [plaintiff]

23  did not rely on any of the statements at issue."); *see also In re Vioxx Cases,* 180 Cal.

24  App. 4th 116, 129 (2009) ("[I]f the issue of materiality or reliance is a matter that would

25  vary from consumer to consumer, the issue is not subject to common proof, and the

26  action is properly not certified as a class action.").

27    Causation, deception, reliance, and injury must be individually established here

28  because (1) Plaintiff cannot allege uniform conduct, given that the users of the 173

DEFENDANT CANON U.S.A., INC.'S MEMORANDUM OF POINTS AND AUTHORITIES
IN OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

NJ-226,919,791v1

Printer models received very different ink level status messages at points when greatly varying amounts of ink may have remained; and (2) determining the amount of ink remaining and whether messages were material to users requires individualized inquiries into how each Printer user reacted to the specific messages that were received, and how each Printer in the putative class was used.  A reasonable user could not logically consider an ink level status message material if the amount of ink in a discarded cartridge is *de minimis*.

This Court previously found that a plaintiff's failure to identify a "single practice, policy or defect affecting all ... proposed class members in the same way" required denial of class certification in *Frosini v. Bridgestone Firestone N. Am. Tire, LLC*, 2007 WL 2781656 (C.D. Cal. Aug. 24, 2007).  In that case, plaintiffs claimed that defendant had sold defective tires and then hid that fact from the public and the federal government. *Id.* at *1.  Plaintiffs argued that defendant's conduct was committed as part of a specific program, "pursuant to which each tire plant was required to cut costs by using inferior materials...." *Id.* at *12.  The proposed class included "'75 distinct populations of Steeltex tires' ... used on 'more than 30 different models of motor homes alone, as well as on a host of [other vehicles]....'" *Id.* at *14.  Moreover, among the 75 different populations were "'variations in size, model, place of manufacture, load capacity, tread design, and design specification....'" *Id.*  Because of those differences, as well as the fact that tire failure could be due to other causes, the Court found that "common questions of law and fact do not predominate . . . ." *Id.* at *15; *see also id.* ("Plaintiffs would have to submit individualized proof to demonstrate that a given Steeltex tire acquired by a class member in the proposed class was defective.").

By contrast, this Court easily found a "single practice, policy or defect affecting all ... proposed class members in the same way" in *Menagerie Prods. v. Citysearch*, 2009 WL 3770668 (C.D. Cal. Nov. 9, 2009).  In that case, the defendant website operator was alleged to have made a "material omission to its [advertising] customers that it fails to detect and prevent invalid clicks [on their advertisements and then charged its customers]

16

... for invalid clicks." *Id.* at *7.  All of the customers in the putative class had entered into "standard form agreements prepared by Citysearch and ... every class member [was] a party to the form contract provisions in dispute." *Id.* at *9; *see also id.* (citing cases holding that "claims arising out of pre-printed form contracts are particularly appropriate for class action treatment"); *see also id.* at *10, n.11 (noting that "Citysearch does not contend that the form agreements varied by class member").  Under those circumstances, the Court had no difficulty finding that the representative "plaintiffs' claims ar[o]se from the 'same event or course of conduct' as those of the various absent class members...." *See id.* at *7.  Thus, because the entire class had the same interest in having the same contractual terms enforced, the Court was able to infer materiality and reliance.[8]

This case is on all fours with *Frosini*, and it is nothing like *Menagarie*.  Plaintiff is attempting to assert claims on behalf of users of 173 Printer models whose different internal configurations affect (among other things) what an ink level status message actually says, what graphics accompany the message and the amount of remaining cartridge ink when the ink level status message is displayed.  Thus, Plaintiff can show no "uniform conduct likely to mislead the entire class" or a "single practice, policy or defect affecting all of Plaintiff's proposed class members in the same way."  Accordingly, Plaintiff must show individualized proof of deception, reliance and injury for each class member, which he cannot do.  The following are some of the more significant individual issues of liability that must be litigated here, which predominate over any common issues of law and fact.

## 1.   <u>What Ink Level Status Message(s) Each User Receives</u>

Contrary to Plaintiff's assertion that all of the ink level status messages are "substantially the same" and "convey the identical message" (Pl. Br. at 6), different

---

[8]  *See also Yokoyama v. Midland Nat. Life Ins.*, 594 F.3d 1087, 1093 (9th Cir. 2010) (requiring no individualized showing of reliance because the "fact-finder will focus on the standardized written materials given to all plaintiffs and determine whether those materials are 'likely to mislead consumers acting reasonably under the circumstances'").

17

1  Printer users in fact receive a wide array of messages depending on their Printer model

2  and the OS running on their computer.  As but one example, some state that the ink "may

3  have run out," whereas others state that the ink "has run out."  Moreover, the language of

4  these messages differs in other respects as well, emphasizing different issues and risks

5  associated with overriding the messages and continuing to print in the "ink out" condition

6  (e.g., potential printer damage vs. poor print quality).  These language differences, in

7  turn, arise from a number of variables, such as the cartridge design and platform used

8  with the Printer, and the time when the Printer was first sold (which reflects the evolution

9  of ink level detection methods).  *See* Factual and Procedural Background

10  ("Background"), *supra,* Sects. B(1), (2), D(1), E(1) & n.2.

11  **2.    <u>User reactions to ink level status message(s)</u>**

12  Printer users react to ink level status messages in a variety of manners.  Many

13  users do not even pay attention to the messages; others (such as Mr. Shein) consciously

14  override the messages so that they can continue to print until print quality becomes

15  unacceptable; and others respond not by replacing the subject ink cartridge, but by

16  refilling it with third-party ink.  In fact, the number of users who respond to ink out

17  messages by immediately stopping printing and replacing the ink cartridge is relatively

18  small.  *See Id.*, Sect. C, *supra.*  For example, while Plaintiff claims to have found the ink

19  level status message he received material, Mr. Shein currently does not and continues to

20  print -- as Dr. Wind has opined is the case with respect to all but a small minority of

21  Printer users.  *See id.,* Sects. C, E(2).  Moreover, user reactions to ink level status

22  messages are impacted by a variety of other factors, including the type of use made of the

23  Printer (e.g., business vs. personal), the number of messages displayed and the manner of

24  display, the relative importance to the user of print quality versus avoiding the risk of

25  printer damage, and the print job and print media being used when the message appears.

26  *Id.*, Sect. C(2), *supra.*

27  Determining each user's specific reaction to the receipt of an ink level status

28  message would require mini-trials of *all* class members to determine who actually was

18

affected by the message, and who pressed a key to continue printing after the message displayed. The predominance requirement thus cannot be satisfied for this reason alone.

### 3. Remaining ink levels in each user's cartridges when messages appear, and whether the user considers that level "material"

Many factors affect the level of cartridge ink remaining when ink level status messages display, including Printer model, ink cartridge platform, and the method of ink level detection used. *See id.* Sect. D(1). The point at which such messages display is also affected by individual user practices, including frequency of use, ink color and print media used, whether the Printer is kept plugged in when not in use, and the use of non-Canon ink. *See id.* Sect. D(2). All of these factors would have to be explored with all class members to determine what level of ink remains in their used cartridges at the point when the ink level status messages appear.

Whether a Printer user considers such an ink level to be material would be another, separate inquiry, as Plaintiff has suggested no measuring stick for materiality. These differences also mean that fashioning a class-wide restitution or damages remedy would be impossible and would again invite thousands of mini-trials. *See, e.g., Hodes v. Van's Int'l Foods*, 2009 WL 2424214 *4 (C.D. Cal. July 23, 2009) (denying certification of class of purchasers of frozen waffles; "[P]laintiffs have not presented the Court with any indication of how to determine the amount of damages suffered by each class member," in light of plaintiffs' inability to identify each of the class members; inability to prove which brand of waffles each member purchased, in what quantity, and for what purpose; and "very low" likelihood that members saved their sales receipts).

### 4. Each user's access to and reliance on additional information regarding remaining ink levels and likely page yields

Depending on the type of ink cartridge (which, in turn, depends on Printer model), a Printer user need not rely on an ink level status message to decide when to replace or refill the cartridge but, instead, can actually observe the remaining ink level. *See id.* Sect. D(1). Similarly, whenever an ink level status message displays on their computers, users

19

who run Windows OS also see a graphic display corresponding generally to the current remaining ink cartridge level. *See id.* Section B(2). In addition, some Printer users (again, depending on Printer model) have access to information on expected "page yields" from ink cartridges. *See id.* Sect. B(3). That information allows the user to estimate the number of pages that can be printed from a particular cartridge. *See id.* Indeed, page yield data for Plaintiff's MP830 model (and the corresponding methodology) is available on CUSA's website, although Plaintiff claimed that he never looked at it. *See id.* Sect. E(2).

The same inquiry that was made of Plaintiff would have to be made of every proposed class member for at least two reasons. First, a Printer user who considers a source of information *other than* an ink level status message to determine the amount of cartridge ink remaining -- whether that source be a visual examination of the cartridge, a graphic display corresponding generally to current remaining ink levels, or something else -- cannot be deemed to have relied on the ink level status message or to have considered it "material." Second, given that the gravamen of Plaintiff's claims is that Printer users were misled into falsely believing that their cartridges were out of ink, if users had available to them (but did not use) information to allow them to estimate the number of pages that they could expect to print from each cartridge, that fact would go directly to the merits of the claims asserted.

The number and importance of the individual issues that would have to be resolved here are very similar to those presented on plaintiffs' class certification motion in *Kandel v. Brother Int'l Corp.,* CV 08-1040 DSF (C.D. Cal., Feb. 1, 2010) (RJN Ex. A). Much like Plaintiff here, the *Kandel* plaintiffs alleged that defendant's laser printers were "designed … so as not to utilize all of the toner in the toner cartridges…." *Id.* at 1. After cataloging the many different responses the named plaintiffs themselves reported upon receiving a "toner empty" message, the Court observed that such responses:

> … indicates the *wide variety of experiences* members of the prospective class are likely to have had with Brother printers and the "toner low" or "toner empty" messages. Given that

20

DEFENDANT CANON U.S.A., INC.'S MEMORANDUM OF POINTS AND AUTHORITIES
IN OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

NJ-226,919,791v1

uses of the printers vary, it is highly likely that *prospective class members differ in the amount of toner remaining when the "toner empty" message is displayed and in their tolerance for reduced quality printing*. This variability suggests that *common issues do not predominate* for the purposes of Rule 23(b)(3).

*Id.* at 5, n.6 (emphasis added). The same conclusion should be reached here.

### 5.   Business v. consumer use of Printers

Another factor that the Court will need to resolve on an individual basis is whether each class member is using the Printer for "personal, family, or household purposes," Cal. Civ. Code § 1761(d), or instead makes primary (or exclusive) use of the Printer for business-related, non-consumer purposes -- primarily where, as here, the user owns an MP830 or one of several other models of Office All-in-One Printers. This inquiry is necessary to determine whether each class member can state a viable CLRA claim, and is thus eligible for a damages recovery (rather than the sole restitutionary recovery available under the UCL). *See* Point II(B), *supra; see also Kandel,* slip op. at 3 (denying class certification in laser printer CLRA case where "the evidence strongly suggests that [plaintiffs'] printers and cartridges were primarily purchased for business and not for personal use").

### 6.   Individual issues predominate even for a class of MP830 users

Given the wide variety of individual user practices (e.g., whether users override messages and continue printing, whether the user is running Windows or Mac OS), use of third-party ink or cartridges, personal vs. business Printer use, frequency of use, ink color and print media used, and whether the Printer is kept plugged in when not in use), common issues would not predominate even if the proposed class consisted only of MP830 model users.

### C.   Plaintiff Has Not Pleaded An Ascertainable Class.

A threshold requirement for class certification is an identifiable and ascertainable class. *Lymburner v. U.S. Fin. Funds, Inc.,* 263 F.R.D. 534, 538 (N.D. Cal. 2010); *see also Whiteway v. FedEx/Kinko's Office & Print Servs., Inc.,* 2006 WL 2642528 *3 (N.D.

21

DEFENDANT CANON U.S.A., INC.'S MEMORANDUM OF POINTS AND AUTHORITIES
IN OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

NJ-226,919,791v1

Cal. 2006) ("An implied prerequisite to certification is that the class must be sufficiently definite."); *see also Mazur v. eBay, Inc.*, 257 F.R.D. 563, 567-68 (N.D. Cal. 2009) (where buyer claimed e-Bay engaged in "shill" bidding, court finds class of "all persons who 'would have won but for the shill bidder' ... wholly unascertainable ... [nor have plaintiffs provided a] method of calculating damages for these 'would-be winners'"); *Kelecseny v. Chevron, U.S.A., Inc.*, 262 F.R.D. 660, 677-78 (S.D. Fla. 2009) (where boat owner claimed fuel producers failed to warn of ethanol damage to fiberglass fuel tanks, court finds class "grossly overbroad" as it included persons already aware of risk, and plaintiff provided "no mechanism for narrowing the class such that members may be readily ascertained"); *Nelson v. Bd. of Educ. of Albuquerque Pub. Schs.*, 2009 WL 6055840 *7 (D.N.M. Jan. 7, 2009) (where parents claimed school board denied their autistic children full school days of free public education, court finds proposed class "impermissibly vague and overbroad" because "members would be impossible to identify prior to individualized fact-finding and litigation").

For the same reasons that Plaintiff cannot show that common issues predominate over individual ones, he cannot show an identifiable and ascertainable class. A class could not include any Printer users who either (1) discard ink cartridges with too little remaining ink to be material; (2) disregard ink level status messages and continue to print until print quality becomes unacceptable; (3) rely on visual observation of the amount of ink remaining in transparent cartridges to determine how much ink is likely remaining, or on page yields to estimate the remaining useful life of the cartridge; (4) refill (rather than replace) their cartridges, since that practice ensures that the user is not discarding unused ink; or (5) primarily use their Printers for business. *See* Background, *supra,* Sects. C, D(2); *id.,* n.5. Inasmuch as Printer users who fall within each of these categories cannot be "identified prior to individualized fact-finding and litigation," Plaintiff's proposed class is "impermissibly vague and overbroad." *See Nelson,* 2009 WL 6055840 at *7.

1    **D.**    **Class Treatment Of Plaintiff's Claims Would Not Be A Superior**

2        **Method Of Adjudication.**

3        Rule 23(b)(3)'s superiority requirement tests whether "class litigation of common

4 issues will reduce litigation costs and promote greater efficiency." *Valentino v. Carter-*

5 *Wallace, Inc.,* 97 F.3d 1227, 1233 (9th Cir. 1996). In determining superiority, courts

6 must consider several factors, including "the difficulties likely to be encountered in the

7 management of a class action." Fed. R. Civ. P. 23(b)(3)(D). Where "the complexities of

8 class action treatment outweigh the benefits of considering common issues in one trial,

9 class action treatment is not the 'superior' method of adjudication." *Zinser v. Accufix*

10 *Res. Instit., Inc.,* 253 F. 3d 1180, 1192 (9th Cir. 2001).

11        "'If each class member has to litigate numerous and substantial separate issues to

12 establish his or her right to recover individually, a class action is not 'superior.'"

13 *Sanchez,* 2009 WL 1514435 at *4 (quoting *Zinser,* 253 F.3d at 1192). The superiority

14 requirement is also not satisfied where plaintiff fails to show "a tenable method for trying

15 th[e] case that avoid[s] extensive individual mini-trials...." *In re Wells Fargo Home*

16 *Mtg. Overtime Pay Litig.,* 2010 WL 174329 *9 (N.D. Cal. Jan. 13, 2010); *see also In re*

17 *Genesisintermedia, Inc. Sec. Litig.,* 2007 WL 1953475 *15 (C.D. Cal. June 28, 2007)

18 (class action not superior where "individual issues of reliance predominate over any

19 common issues, thus requiring the need for 'mini trials' on the issue of reliance.").

20        Because literally thousands of mini-trials would be required to resolve the

21 individual issues discussed in Sections B ("Predominance") and C ("No Ascertainable

22 Class") above, the superiority requirement is not met for that reason alone. In addition,

23 because it is impossible to determine how many ink cartridges a Printer user discarded or

24 how much ink, if any, remained in such cartridges, it is also impossible to determine any

25 individual class member's recovery or how much non-Canon ink someone used. *See*

26 *Caro v. Proctor & Gamble Co.,* 18 Cal. App. 4th 644, 665 (1993) (although "difference

27 in computing damages is not sufficient to deny class certification, differences in the

28 actual existence of damages or in the manner of incurring damages are appropriate

1  considerations"). Under these circumstances, a class action would be entirely
2  unmanageable and, thus, not a superior method of adjudication.

3      **E.      Plaintiff's Claims Are Not Typical Of Those Of The Proposed Class.**
4          To satisfy Rule 23(a)(3)'s typicality requirement (that "the claims . . . of the
5  representative parties are typical of the claims . . . of the class"), the Court must
6  determine "'whether other members have the same or similar injury [as the named
7  plaintiffs], whether the action is based on conduct which is not unique to the named
8  plaintiffs, and whether other class members have been injured by the same course of
9  conduct.'" *Wiener v. Dannon Co.,* 255 F.R.D. 658, 665 (C.D. Cal. 2009) (citation
10 omitted). *See also Gonzalez v. Proctor & Gamble Co.,* 247 F.R.D. 616, 622 (S.D. Cal.
11 2007) (typicality requirement is not met "'when named plaintiffs are subject to unique
12 defenses which could skew the focus of the litigation'").

13         Plaintiff cannot satisfy typicality. First, Plaintiff uses only one model, the MP830,
14 which is not typical of the other Printer models at issue. As an MP830 user, Plaintiff is
15 among the less than 10% of all Printer users who actually get an "ink has run out"
16 message that could likely be seen. In addition, Plaintiff's MP830 is unique in
17 comparison with other Printer models in that it incorporates a later-generation, more
18 accurate ink level detection function, yet still retains the early-generation "ink has run
19 out" initial message design. *See id.* Sect. E(1).

20         Plaintiff also uses his Printer infrequently, typically printing only a couple of pages
21 of black-and-white text, sometimes a few color photos and, on occasion, color text. *See*
22 Background, *supra,* Sect. E(2). Because infrequent use affects when ink level status
23 messages appear (*see id.* Sect. D(2)), that alone makes Plaintiff different from many other
24 users. Moreover, Plaintiff's Printer is connected to a Mac. That means that, unlike
25 Printer users whose computers run on Windows OS, when Plaintiff receives an ink level
26 status message, he can only view a graphic display corresponding generally to the current
27 remaining ink level in the cartridge by running a special printer utility program for each
28

NJ-226,919,791v1

print job. *See id.* Sect. B(2). The messages viewable by Plaintiff are also less sophisticated than those viewable by Windows OS users. *See id.*

Furthermore, Plaintiff admits that his reaction to "ink out" messages (allegedly to always immediately replace the cartridge) is different from that of other Printer users who generally ignore the messages and continue to print. *See id.* Sect. E(2). Plaintiff also claims that, although page yield information on his MP830 Printer is available on CUSA's website, he did not visit that website, nor did he try to locate any other source of information that would allow him to estimate, based on his particular printing needs and practices, how many pages he could reasonably be expected to print from each cartridge that he purchased. *Id.*

All of these are serious and substantial differences that set Plaintiff well apart from the members of the proposed class -- including other MP830 users -- and make him 'subject to unique defenses which could skew the focus of the litigation." *See Gonzalez,* 247 F.R.D. at 622. The typicality requirement is therefore not met, either with respect to the 173 Printer models in the class definition or to Plaintiff's own MP830 model Printer.

## IV.   **CONCLUSION**

For the foregoing reasons, together with those set forth in the accompanying Yamamoto, Groves and Miller Declarations and the Wind Report, CUSA respectfully requests that no class of owners or lessees of Canon-brand PIXMA inkjet printers be certified and that Plaintiff's motion be denied in all other material respects.

Dated:  June 7, 2010

GREENBERG TRAURIG, LLP

By: */s/ JEFF E. SCOTT*

Jeff E. Scott

Attorneys for Defendant Canon U.S.A., Inc.

NJ-226,919,791v1